# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 24-4799

STEPHANIE ORTEGA, APPELLANT

V.

DOUGLAS A. COLLINS,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued December 16, 2025)                    Decided April 13, 2026)

*Michal Leah Kanovsky*, with whom *Glenn R. Bergmann*, both of Rockville, Maryland, was on the brief, for the appellant.

*Kirsten S. Dowell*, Appellate Attorney, with whom *Danielle A. Runyan,* Acting General Counsel; *David L. Quinn*, Assistant Chief Counsel; and *Carolyn F. Washington*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before FALVEY, LAURER, and JAQUITH, *Judges*.

FALVEY, *Judge*, filed the opinion of the Court. JAQUITH, *Judge*, filed an opinion concurring in part and dissenting in part.

FALVEY, *Judge*: Army veteran Stephanie Ortega, through counsel, appeals an April 4, 2024, Board of Veterans' Appeals (Board) decision granting an initial 50% rating for cephalgia (head pain); denying a rating above 10% for gastroesophageal reflux disease (GERD) and a compensable rating for left knee surgical residual scars; and denying service connection for chronic fatigue syndrome (CFS), left and right foot hallux valgus (claimed as bunions), and left and right foot pes planus.

We called this case to panel to address two matters: (1) did the Board violate Ms. Ortega's due process rights when it notified her that it received her VA Form 10182 (Notice of Disagreement or NOD) after the 90-day deadline to submit evidence had already passed; and (2) what happens when the agency of original jurisdiction (AOJ) lists an incorrect "favorable" finding in its decision.

We don't answer the first question. Even if we assume a notice error, we can't see how it prejudiced Ms. Ortega. When she appealed to the Board, she used a form that told her that she had

90 days to submit evidence. She didn't. In fact, she never tried to submit any evidence as part of her Board appeal. Thus, we don't need to weigh in on the Board's notice obligations when nothing suggests Ms. Ortega was impacted by evidentiary notice problems.

At first blush, we don't need to answer the second question either. We can, and do, remand Ms. Ortega's foot claims because VA obtained inadequate exams and the Board ignored contrary evidence when it concluded that she had a foot disability that preexisted service. But to ensure that she is not plagued by any potential confusion from flawed favorable findings, we clarify that only findings that are favorable are binding on subsequent VA adjudicators. That's what Congress required. And here, the AOJ's finding was not favorable to Ms. Ortega. Thus, it doesn't bind VA on remand.

After resolving these matters that require a precedential opinion, we also address three issues that do not. *See Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990). We find that the Board provided inadequate reasons or bases for its determinations about CFS, GERD, and left knee scars.[1]

In the end, we vacate the parts of the Board decision concerning bilateral hallux valgus, bilateral pes planus, CFS, GERD, and left knee scars and remand those claims for readjudication consistent with this decision and our instructions. And we affirm the part of the Board decision regarding cephalgia.

## I. ANY BOARD ERROR CONCERNING NOTICE WAS NOT PREJUDICIAL

When claimants appeal to the Board and choose the evidence submission docket, they can submit evidence with their NOD or they have 90 days from when the Board receives their NOD to submit that evidence. 38 U.S.C. § 7113(c). Ms. Ortega argues that the Board violated her due process rights by waiting until after that 90-day period to notify her of receipt of her NOD. Appellant's Brief (Br.) at 13. As we explain, any notice error was harmless given the facts here. To understand why, we start with how Ms. Ortega appealed to the Board.

---

[1] Much like our discussion of the foot exams or the Board's reasons or bases for finding that the foot disabilities preexisted service, our decision on CFS, GERD, and left knee scars does not establish new, binding precedent.

2

A. Background

In a September 2020 decision, the AOJ granted service connection for cephalgia with a 30% rating effective October 2019; continued a 10% GERD rating and a 0% left knee scar rating; and denied service connection for CFS, bilateral hallux valgus, and bilateral pes planus. Record (R.) at 489-90.

Ms. Ortega appealed the AOJ decision to the Board, choosing the evidence submission review option. The form she used stated: "I have additional evidence in support of my appeal that I will provide within the next 90 days." R. at 467. Ms. Ortega mailed the form, without more evidence, on October 27, 2020. R. at 465.

Despite what the form said, Ms. Ortega did not submit any evidence "within the next 90 days." Nor did she submit evidence after the Board received her appeal. The date stamp on the form and the envelope show that VA received it on November 5, 2020. R. at 465-67. From this date, Ms. Ortega had 90 days—until February 3, 2021—to submit evidence to the Board.

The day after this period expired, the Board sent Ms. Ortega a letter stating that it had received her appeal. Despite the time having run, the Board told her that she had "90 days from the date of the Board's receipt of [her] Board Appeal . . . to submit new evidence." R. at 428. Unhelpfully, the letter did not tell Ms. Ortega when the Board had received her appeal.

Sometime in January 2023, VA associated more treatment records with Ms. Ortega's claims file, some of which Ms. Ortega believes are important for her claims.[2] In the decision on appeal, the Board stated that its decision was "based on the evidence of record as of the date the September 2020 rating decision was issued, any evidence submitted with the Veteran's [NOD], and any additional evidence submitted within 90 days following receipt of her NOD. . . . The Board has not considered any evidence other than that noted." R. at 8; *see* R. at 5-6. In short, the Board considered none of the records VA received in January 2023.

---

[2] The exact date when VA obtained these records is unclear, but it no longer appears disputed that VA obtained and uploaded them and that it did so in January 2023. *See* Appellant's Br. at 9-10 (citing evidence in the record from January and February 2021 but not stating when it was submitted and the cited documents not containing a VA date stamp); Secretary's Br. at 5 (asserting that approximately 2 years after the February 2021 Board letter, Ms. Ortega submitted evidence); Appellant's Reply Br. at 1 (stating that she did not file that evidence and instead "[t]hey were obtained by the [AOJ] on Jan. 4, 2023, accompanied by a service treatment record (STR) certification noting 'records being enclosed herein' the bulk of which were electronic"); R. at 143 (a service treatment records certification form from the Army to VA); R. at 202, 229 (the cited medical evidence noting a Department of Defense ID and that they were created on January 4, 2023); Oral Argument (OA) at 23:18-23:38, https://www.youtube.com/watch?v=TZIbgLGby2E (during oral argument, the Secretary informed the Court that he had mistakenly stated in his brief that Ms. Ortega submitted the evidence and noting that "VATRs" were associated with the file).

3

B. Analysis

The crux of Ms. Ortega's appeal is that she believes VA never gave her adequate notice about how long she had to submit evidence. As she sees it, the Board erred by notifying her of its receipt of her NOD after the 90-day period for submitting evidence without offering a clue that her deadline had passed. Appellant's Br. at 13.

This matters because, as the Board explained, the record that it can review is limited to evidence considered by the AOJ in its decision, as well as "[e]vidence submitted by the appellant . . . , if any, with the [NOD] . . . [or] within 90 days following receipt of the [NOD]." 38 U.S.C. § 7113(c) (evidence submission docket); *see* 38 C.F.R. § 20.303 (2025) (the implementing regulation). Thus, it seems reasonable that a claimant would care about the date that the Board received the NOD; after all, Congress decided that the 90-day submission deadline would start on this date. Even so, if, when, or how VA must notify the claimant about this date is not something we resolve today.

This is because, even accepting that an error happened here, any such error is not prejudicial to Ms. Ortega; she never tried to submit any evidence. When she completed her NOD, the form told her that she had 90 days to submit evidence. She didn't. Indeed, between when she mailed her NOD on October 27, 2020, to when the Board issued its decision nearly 4 years later in August 2024, including after the Board sent the February 4, 2021, letter, we find no indication that Ms. Ortega wanted to submit evidence but was stopped by inadequate notice. We are thus not surprised that the Board did not consider if any notice gaps affected her ability to pursue this appeal; the Board must address only those issues raised by the claimant or the record. *See Robinson v. Peake*, 21 Vet.App. 545, 552-53 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009).

At bottom, with nothing to suggest that Ms. Ortega even tried to submit any evidence with or following her NOD, we see only harmless error; her notice arguments thus become inconsequential. *See* 38 U.S.C. § 7261(b)(2) (providing that the Court must "take due account of the rule of prejudicial error"); *Shinseki v. Sanders*, 556 U.S. 396, 409-410 (2009) (finding that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"). Our review of her circumstances and the record confirms that Ms. Ortega was not harmed by a lack of clarity on the exact timeline to submit evidence. S*ee Slaughter v. McDonough*,

4

29 F.4th 1351, 1355 (Fed. Cir. 2022) (holding that our Court must look to the circumstances of the case when considering prejudicial error).

During oral argument, Ms. Ortega asserted that she did not submit evidence because, when she received the letter, she thought it was too late to do so. OA at 16:20-17:30. But her purported reliance on the VA letter is confusing. First, the letter didn't tell her when VA received her NOD, so it's unclear why she'd think she already missed her chance. If anything, the letter invited her to submit evidence by repeating the general 90-day deadline (despite that deadline having passed). And even before this letter, Ms. Ortega filled out a form that told her to submit evidence along with the NOD or within the next 90 days.

We are similarly not convinced by Ms. Ortega's vague invocation of delays around the COVID-19 pandemic and her related expectation for specific notice. She states that it was her expectation that she would be notified when VA received her NOD and she would then submit evidence. OA at 16:52-17:10. But we can't understand the origin of this expectation.[3] Again, the NOD stated that she would provide any additional evidence "within the next 90 days." R. at 467. And Ms. Ortega knew when she mailed the NOD. It is true that she might not have known the exact date that VA received it, but she was aware of the general 90-day period and submitted no evidence.[4]

---

[3] We understand that VA, when implementing the Veterans Appeals Improvement and Modernization Act (AMA) and addressing 38 C.F.R. § 20.202(b)(3) (described as "Submission of Evidence in Conjunction With Notice of Disagreement") and commenting that it would be difficult to calculate the relevant deadlines because VA did not provide adequate notice of when it received the NOD, said that it was the Board's practice to notify veterans when an appeal had been received and docketed at the Board. 84 Fed. Reg. 138, 152 (Jan. 18, 2019) (noting that, as the precise procedures for providing such notice might change based on technological systems, VA would continue to address this matter through procedural guidance). But neither Ms. Ortega's pleadings nor her oral argument make clear that she relied on this regulatory history in forming an expectation that clear notice would come and that she would then submit evidence.

We note that, despite its regulatory commitment, VA appears to have done nothing to fix the issue it identified in rulemaking. And perhaps a panel will one day soon address the evidence submission issues raised in that regulatory history. But, as we stress throughout the opinion, we do not reach those questions today because we do not understand how any of those notice issues impacted Ms. Ortega.

[4] In her reply brief, Ms. Ortega attached the current NOD form, which has different language than the form she completed in 2020. The prior form stated: "I have additional evidence in support of my appeal that I will provide within the next 90 days." R. at 467. The current form says: "I have additional evidence in support of my appeal that I will submit to the Board with my [NOD] or within 90 days of the Board's receipt of my [NOD]." Appellant's Reply Br.; App. 2. She argues that the language change shows that the information in the form she completed was inaccurate. *Id*. at 3. First, we're reluctant to infer error from VA's attempt to make its forms clearer; for sound policy reasons, the law frowns on imposing liability for remedial measures. *See, e.g.*, FED. R. EVID. 407. Second, and as we explain in depth, this is particularly true when the NOD plainly put her on notice that there was a ticking 90-day clock for her to

Her failure to submit any evidence, or even flag confusion about her time to submit evidence to the Board, is what renders any Board error harmless. We agree with her that Congress's choice to tie the evidence submission deadline to when VA receives a document, without then establishing any requirement that VA notify the claimant once it receives that document, creates gaps.[5] But with no suggestion of prejudice in the record, Ms. Ortega's due process argument is the sort of grand facial challenge that does not fare well absent a more developed argument. "We reject that argument, although we don't foreclose the possibility that there could be a violation of . . . due process principles in a specific case. But we don't see that here." *Bilharz v. Collins*, 38 Vet.App. 366, 377 (2025).

Besides identifying nothing in the record to suggest that the lack of clarity about the deadline to submit evidence impacted her, Ms. Ortega also fails to address the process, explained below, that is available to those veterans who might find themselves in the evidentiary window gaps potentially created by the AMA.

This two-part omission ultimately makes her due process contentions underdeveloped. *See Locklear v. Nicholson*, 20 Vet.App. 410, 416 (2006) (holding that the Court will not entertain underdeveloped arguments); *Evans v. West*, 12 Vet.App. 22, 31 (1998) (noting that the Court will disregard vague assertions and unsupported contentions).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). And in making her due process challenge, Ms. Ortega does not, among other things, acknowledge the options already available to those veterans who want to submit evidence.

---

submit evidence. True, we will likely have to consider the potential evidentiary windows or notice problems that could exist in the AMA world. But we don't see how they affected Ms. Ortega. Thus, that is a matter for another panel.

[5] Ms. Ortega suggests that such a notice requirement is found in 38 C.F.R § 3.110, which says that the period for taking any action required of a claimant shall run from the date that VA sends a claimant notice of that required action. That may be. As the veteran notes, Appellant's Reply Br. at 6, the Court in *Rowell v. Principi*, 4 Vet.App. 9, 15 (1993), said that § 3.110 clarified the time limit for filing an NOD; that is, it related challenging a rating decision with § 3.110. However, that case, one of only two precedential cases before our Court discussing § 3.110, predates the AMA. There are questions remaining as to whether and how § 3.110 applies to an NOD under the AMA and how that regulation interplays with 38 CF.R. § 20.110, which provides for the computation of time for filing "any written document" with the Board. But the panel does not reach those questions today because, again, Ms. Ortega was not harmed by any VA notice error.

She doesn't explain why, even with the right to due process, an appellant could not confirm with VA that it had received the NOD, particularly here where Ms. Ortega states she was concerned about delays due to the pandemic.[6] Those represented by attorneys, agents, or veterans service organizations who have electronic access to VA claims files should have an even easier time. And even if veterans can't do that and miss the statutory deadline to submit evidence, VA may still consider waiving that 90-day deadline. *See Bolds v. McDonough*, 37 Vet.App. 359, 367 (2024) (holding that section 7113's evidence submission limitation is a claims-processing rule subject to Secretarial waiver).

If all that fails, Congress did not leave veterans who have new evidence but missed their Board shot without a process. Such veterans, including Ms. Ortega, can submit supplemental claims. This option permits review of their claim and that evidence by the AOJ (and if need be, the Board) all without a loss of the effective date. *See Andrews v. McDonough*, 34 Vet.App. 151, 160 (2021) (explaining how a supplemental claim provides a process for those who want to submit evidence under the AMA).

Ultimately, we do not need to decide whether any of these options provide a meaningful opportunity to be heard that is enough to prevent a due process issue. They may not be enough. But as we've said, Ms. Ortega has not shown that she was impacted by any notice issues; she did not submit or try to submit evidence. And at this point, there is no reason for us to explore the matter further. *See Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1337–38 (Fed. Cir. 2007) (holding that "federal courts are to decide only 'actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it'") (quoting *Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960)).

---

[6] Although this does not impact our decision, it appears that VA provides a portal for veterans to check the status of their claims, including to inform them when "[t]he Board . . . is holding [the] case open for new evidence for 90 days." *See* https://www.va.gov/resources/what-your-decision-review-or-appeal-status-means/ (last visited March 26, 2026). Without access to the portal, we do not know if it provides information about Board receipt of an NOD or the evidence submission window. What's more, we do not decide here whether this is sufficient process. But it would be helpful in future cases to determine whether such options do give adequate process.

7

"[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." *PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

Because the unsuccessful notice argument was the only challenge Ms. Ortega raised regarding the Board's grant of a 50% cephalgia rating, *see* Appellant's Br. at 20 (briefly asserting that if it were not for the Board's deficient February 2021 letter, it was unknown whether she would have submitted more evidence to support an extraschedular cephalgia rating),[7] we will affirm that part of the Board decision. Ms. Ortega made other arguments about her other claims. And so, we will address those in turn, starting with the other panel question first.

## II. ONLY FAVORABLE FINDINGS ARE BINDING

Ms. Ortega had multiple periods of active service. Some evidence suggests her foot disability preexisted service; other evidence—including exams that noted information about her feet—suggests the opposite. This evidence showed no foot problems in service or between periods of service.

Without ever addressing why Ms. Ortega's foot disability seemingly disappeared between these multiple medical exams, VA developed her claim with a focus on whether her disability was aggravated by service. This led to inadequate exams and inadequate reasons or bases. Resolving this exam issue or the Board's reasons or bases error does not create new precedent.

The novel question is what to do about another AOJ error. In the September 2020 decision, the AOJ went as far as labeling the conclusion that her disability preexisted service as favorable. Everyone agrees that this is not actually a favorable finding, at least in the direct service connection context. *See* Appellant's Br. at 13; Secretary's Br. at 14; OA at 33:55-34:53. But Ms. Ortega is concerned that she is stuck with it because the AOJ called it favorable. As we explain, that is not

---

[7] Unlike Ms. Ortega, the dissent argues that the Court should remand the cephalgia claim because the Board did not address whether an extraschedular rating was warranted for that condition. But again, Ms. Ortega raised no such argument in her pleadings or during oral argument. She mentioned an extraschedular cephalgia rating just once and only in her opening brief. Appellant's Br. at 20 ("It is also unknown whether she would have submitted more evidence to support increased ratings for GERD, an extraschedular rating for cephalgia, or service connection for her foot conditions."). So the majority did not consider remanding the cephalgia claim based on that theory. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (finding that, "as a general rule, our system is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief") (alteration in original) (citations omitted).

the case; the statute makes only favorable findings binding. With this top-level overview, we can look at the details of Ms. Ortega's foot claim.

## A. Background

Ms. Ortega had active duty in the Army Reserve from February 2009 to August 2009, December 2009 to December 2010, and November 2017 to October 2018. R. at 2977, 2978, 2514. It appears that the Board might have overlooked the first period of service. *See* R. at 7 (the Board only noting active duty service from December 2009 to December 2010 and November 2017 to October 2018). But the Secretary acknowledges all three periods of active duty service. Secretary's Br. at 2.

The entrance examination for her first period of service noted mild asymptomatic bilateral hallux valgus and pes planus. R. at 1232 (November 2008 entrance examination). But in Ms. Ortega's November 2008 report of medical history, she denied any foot trouble. R. at 1217. There is no separation examination for this period of service in the claims file. *See* Appellant's Br. at 3. During a March 2011 VA examination for Ms. Ortega's knee, the foot disabilities seemingly disappeared, as the examiner noted no bilateral foot symptoms or flare-ups of foot disease. R. at 3325. In July 2011, VA issued a memo stating that requested STRs were unavailable. R. at 3254. Ms. Ortega's foot disability was not referenced during a November 2011 VA Gulf War examination; the examiner noted no bilateral foot symptoms or flare-ups of foot disease. R. at 3194. And a September 2018 separation examination similarly noted that the veteran's feet were normal. R. at 1569.

In January 2020, Ms. Ortega filed a claim for service connection for bilateral pes planus and bunions. R. at 989. She submitted a private December 2019 examination from a chiropractor, Dr. Coley. Dr. Coley noted that the veteran began experiencing chronic foot pain during active duty service and had bunions in service. R. at 993-94. She diagnosed bilateral pes planus complicated by plantar fasciitis and bunions, noting that the onset was during service. *Id*.

Later in January 2020, VA requested an examination, phrasing the question to the examiner for each condition as follows: "Aggravation of a pre-existing condition. Was the Veteran's [foot condition] (which clearly and unmistakably existed prior to service) aggravated beyond its natural progression by preexisting on entrance exam during service?" R. at 596, 597, 598, 99.

In August 2020, a VA examiner diagnosed bilateral hallux valgus and pes planus, R. at 569, but said there was no plantar fasciitis diagnosis as "[s]ymptoms are subjective only," R. at

9

566, 586. The examiner noted that the onset was 2009 and that Ms. Ortega reported that her boots aggravated her feet and her condition worsened when she was deployed to Kuwait in 2018. R. at 571 (stating that she was on her feet for 12-hour shifts and experienced worsening foot pain and cramping). The examiner opined that bunions were not clearly and unmistakably aggravated beyond their natural progression by an in-service injury and that "[t]emporary aggravation is plausible, but there is no evidence of permanent aggravation of the pre-existing [b]union right foot." R. at 562-63, 588-89.

VA then asked for an examination about the left bunion and bilateral pes planus, again phrasing the question about each condition as follows: "Aggravation of a pre-existing condition. Was the Veteran's [foot condition] (which clearly and unmistakably existed prior to service) aggravated beyond its natural progression by preexisting on entrance exam during service?" R. at 558-61.

In September 2020, a VA examiner opined that it was less than likely that her left foot bunion and bilateral pes planus, complicated by plantar fasciitis, was aggravated beyond its natural progression "by preexisting on entrance exam during service," explaining that the available service treatment records showed no chronic diagnosis, complaint, evaluation, or treatment for a left foot bunion or bilateral pes planus during active duty service. R. at 546, 550, 554 (also noting no complaints about a left foot bunion or bilateral pes planus in her October 2018 separation exam).

Later in September 2020, the AOJ denied service connection for hallux valgus and pes planus. R. at 490; *see* R. at 489 (like the Board, also noting only her last two periods of active duty service and not mentioning the first period from February to August 2009). This is the rating decision that contains the flawed "favorable findings" that the claimed foot conditions existed before service and that the November 2008 entrance examination showed a diagnosis of those conditions. R. at 493-96. In November 2020, VA received her appeal. R. at 467.

In the April 2024 decision on appeal, the Board found that, because the November 2008 entrance examination noted hallux valgus and pes planus, the presumption of soundness did not apply. R. at 21. The Board stated the following:

> [N]otwithstanding the standard the AOJ asked the examiner to apply in rendering the requested opinion, the Board finds that the Veteran is not entitled to the standard of clear and unmistakable evidence, as both conditions were noted on an entrance examination, and the Veteran has not carried her burden of showing that the conditions increased in severity during her active service. The proper standard for the opinion was whether it is approximately at least as likely as not that the

10

Veteran's existing disabilities increased in severity. The Board finds that the evidence is persuasively against a finding of increased severity of either.

R. at 22.

The Board acknowledged the veteran's lay statements and those reported to Dr. Coley, who noted that onset of the foot conditions began during active duty service. *Id*. But the Board found that Dr. Coley did not indicate that she knew that both conditions existed before service. *Id*. The Board also determined that Ms. Ortega's statements were at odds with her service treatment records and separate claim for service connection for varicose veins. *Id*. The Board noted that, although the veteran reported being on a running profile because of a foot condition, a 2017 service treatment record showed that she was excused from running because of her left knee. *Id*. The Board also highlighted that, in earlier statements, she had reported that being on her feet for 12-hour shifts aggravated her leg pain and caused varicose veins but then, in a later statement, she said those shifts caused feet pain and cramping. *Id*. The Board also looked to the lack of any complaints of foot symptoms on her November 2018 separation exam, even as she reported that joint pain was due solely to her knee disability. In that same report, her feet were assessed as normal. *Id*.

The Board stated that, "[a]s concerns the VA examiner's initial opinion that temporary exacerbations of the hallux valgus and pes planus was plausible, the Board interprets that statement as meaning that it was not out of the realm of possibility, which the examiner may have based on the Veteran's lay reported history." R. at 22-23. But the Board found that "plausible does not equate to probable." *Id*. The Board concluded that the examiner opined that her review of the service treatment records did not reveal a basis for her to state that the veteran's "current state" of hallux valgus and pes planus was due to the rigors of her active duty service. R. at 23. Thus, the Board denied service connection for the foot conditions.

## B. Analysis

Challenging the premise that her disability preexisted service, Ms. Ortega argues that to adopt the RO's or Board's findings, one would have to believe that she had preexisting hallux valgus and pes planus in November 2008, which then disappeared between various VA and military examinations. Appellant's Br. at 22. She asserts that neither the AOJ nor the Board acknowledged these seemingly contradictory facts and based their findings of her conditions preexisting service on only the 2008 entrance examination. *Id*. She also highlights that her service treatment records were lost so there is an incomplete picture of her medical history during service. *Id*. She contends that the AOJ did not consider this before determining that its findings that her

11

conditions preexisting service were "favorable" to her and that the Board blindly accepted those findings. *Id*. at 22-23.

Ms. Ortega also argues that the Board did not discuss whether the duty to assist was satisfied when the VA examiners were told that her foot conditions "'clearly and unmistakably existed prior to service'" and "then asked a nonsensical question of whether a preexisting condition could be 'aggravated' by 'preexisting on entrance exam.'" *Id*. at 23.

The Secretary responds that "the Board did not merely adopt the AOJ's unfavorable findings"; instead, it independently concluded that the foot conditions clearly and unmistakably preexisted service because those conditions were noted on the November 2008 entrance examination. Secretary's Br. at 14 (later acknowledging that the findings that the foot conditions preexisted service were "arguably unfavorable"). The Secretary did not address Ms. Ortega's argument that the Board failed to discuss whether the duty to assist was met. On balance, we agree with Ms. Ortega.

With so much evidence against the conclusion that Ms. Ortega had a preexisting foot disability, we'd expect some discussion from the Board on why it found otherwise. After all, the Board is required to discuss such favorable evidence. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam* 78 F.3d 604 (Fed. Cir. 1996). In short, the Schrödinger-esque nature of Ms. Ortega's potentially preexisting condition called for a response from the Board. The Board's silence requires remand. *See id*.

The inadequacy of the August and September 2020 VA examinations also requires remand. First, recall that the Board acknowledged that the standard in the VA examination requests was improper: "notwithstanding the standard the AOJ asked the examiner to apply in rendering the requested opinion . . . The proper standard for the opinion was whether it is approximately at least as likely as not that the Veteran's existing disabilities increased in severity." R. at 22. The Board was right that this was the wrong standard.

Under 38 U.S.C. § 1153, "[a] preexisting injury or disease will be considered to have been aggravated by active . . . service, where there is an increase in disability during such service, unless there is a specific finding that the increase in disability is due to the natural progress of the disease." In other words, the veteran must show that service increased the severity of the preexisting disability beyond its natural progression. *Jensen v. Brown*, 19 F.3d 1413, 1417 (Fed. Cir. 1994).

12

Unsurprisingly, the VA examination requests that contained the incorrect standard, *see* R. at 559-61, 596-99 ("Was the Veteran's [foot condition] (which clearly and unmistakably existed prior to service) aggravated beyond its natural progression by preexisting on entrance exam during service?"), resulted in inadequate VA examinations, *see* R. 563, 589 (the August 2020 examiner opining that "[t]emporary aggravation is plausible, but there is no evidence of permanent aggravation of the pre-existing [b]union right foot"); R. at 546, 550, 554 (the September 2020 examiner opining that it was less than likely that her left foot bunion and bilateral pes planus complicated by plantar fasciitis was aggravated beyond its natural progression "by preexisting on entrance exam during service").

An adequate examination "sufficiently inform[s] the Board of a medical expert's judgment on a medical question." *Monzingo v. Shinseki*, 26 Vet.App. 97, 105 (2012). If the question posed by VA contains an incorrect, nonsensical standard and the examiner responds to that question by reiterating the incorrect standard, then the Board was not sufficiently informed on that matter. Here, in the September 2020 VA examination's conclusion, the examiner repeated the nonsense contained within the examination request. R. at 546, 550, 554. And the August 2020 examination addresses only right foot hallux valgus and provides inadequate rationale for its conclusion about "temporary" aggravation. *See Nieves-Rodriguez v. Peake*, 22 Vet.App. 295, 304 (2008) (holding that an adequate examination contains sufficient detail and rationale to permit the Board to make a fully informed decision on a claim). Thus, remand is warranted for VA to obtain a new examination with the proper standards for the bilateral hallux valgus and bilateral pes planus claims.

With reasons or bases remands and remands for new exams, we would ordinarily not address other arguments that would not provide a greater remedy. Nor would we convene a panel where all we're doing is applying well-settled law. But we have discretion to address additional issues to provide guidance to VA on remand. *See Quirin v. Shinseki*, 22 Vet.App. 390, 395 (2009). What's more, clarifying the status of the flawed favorable findings would provide Ms. Ortega with additional benefits—she wouldn't be tied down by the binding nature of favorable findings. And this is a novel issue that requires precedent. *See Frankel*, 1 Vet.App. at 25-26.

In 38 U.S.C. § 5104(b)(4), Congress requires VA to identify findings that are favorable to the claimant. Besides ensuring clarity and helping claimants decide how to structure any needed appeal, this matters because "[a]ny finding favorable to the claimant . . . shall be binding on all

13

subsequent adjudicators within the Department, unless clear and convincing evidence is shown to the contrary to rebut such favorable finding." 38 U.S.C. § 5104A. VA's regulation similarly makes "[a]ny finding favorable to the claimant made by either a VA adjudicator . . . or by the Board . . . binding on all subsequent [AOJ] and Board . . . adjudicators, unless rebutted by evidence that identifies a clear and unmistakable error in the favorable finding." 38 C.F.R. § 3.104(c) (2025).

Congress decided that only favorable findings would be binding on subsequent adjudicators. The ordinary meaning of favorable would include those findings that are advantageous or give a result in one's favor. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) (holding that, in statutory interpretation, a court's starting point is the ordinary meaning and structure of the law); *see also* https://www.merriam-webster.com/dictionary/favorable (last visited March 26, 2026). Thus, a finding is only binding if it is advantageous or helps the claimant. And when that finding doesn't help, Congress did not want VA to treat it as binding. The simple inquiry for any VA adjudicator when considering awarding a benefit is whether a finding helps the claimant get that particular benefit; if it does, the finding is binding absent clear error—at least with respect to that issue. If it doesn't help, the adjudicator is not bound by that finding.

Here, we don't know whether the Board thought it was bound by the AOJ calling the finding about a preexisting disability favorable, because the Board didn't address this issue. If it did, such a conclusion here would be plainly wrong. This isn't to say that finding a preexisting disability can never be favorable. Obviously in a case focused on establishing aggravation of a preexisting disability, getting this element checked off as favorable would help. And without exhausting all other possibilities for how this could be favorable, such a finding could indirectly help ensure that a claimant meets the current disability element needed for service connection. But here, the AOJ had already favorably found that Ms. Ortega had a current disability. And so, the finding that Ms. Ortega's foot conditions preexisted service appears to be entirely unfavorable. If a condition preexisted service, that means that the presumption of soundness—a presumption that is generally beneficial to veterans—does not apply. *See Horn v. Shinseki*, 25 Vet.App. 231, 234 (2012) ("The burden then falls on VA to rebut the presumption of soundness."). Thus, the AOJ's finding has no binding effect on the Board or subsequent VA adjudicators.

Besides raising questions about the binding effect of the finding, Ms. Ortega also argued that VA gave her inadequate notice by mislabeling the finding. We don't need to reach that

14

question, given that her case is returning to the AOJ for a new exam. The record will reopen once the case is back with the AOJ and Ms. Ortega now knows that the finding is not favorable.

What's more, we have already observed that 38 C.F.R. § 20.802(a) gives the Board authority to consider remanding for correction of errors in addition to duty to assist errors. *See Gladish v. Collins,* 39 Vet. App. 1, 14 (2025). Had Ms. Ortega brought up her notice confusion to the Board, or if the error was reasonably raised as a problem by the record, our precedent already provides a remedy. *Id*.

### C. Remand Instructions

Where does this leave us? The Board failed to consider the records showing that Ms. Ortega did not have a foot disability before her last period of service. Thus, we are vacating the Board's finding that the foot conditions preexisted service. And because VA obtained medical exams using the wrong standard, the Board must return this matter to the AOJ so that VA can obtain exams under the proper legal standard—that is, the new VA foot examination should reflect the correct standards regarding preexisting conditions, presumption of soundness, direct service connection, and aggravation. When the AOJ readjudicates this claim or obtains new exams, it is not bound by the flawed finding that Ms. Ortega's disabilities preexisted service, just as it is not bound by any finding that is not favorable to her.

### III. NON-PRECEDENTIAL DETERMINATIONS

We will now address three non-precedential matters concerning the CFS, GERD, and left knee scar claims. Much like our findings above about the foot exams or the Board's reasons or bases, these determinations do not create precedent.

### A. CFS

Ms. Ortega notes that the Board found that the September 2020 "VA examination report does not include any findings that would trigger a work-up, to include the fact that the examiner did not suggest that one was needed to determine if the Veteran has CFS," but argues that this is not what the examination stated. Appellant's Br. at 27 (citing R. at 19, 532-41).

In September 2020, the VA examiner noted that Ms. Ortega reported experiencing extreme fatigue after deployment and that she "has made an appointment for a work-up for [CFS], but due to C[OVID-19], veteran has been unable to get in with VA PCP." R. at 533. When asked, "Have other clinical conditions that may produce similar symptoms been excluded by history, physical

examination, and/or laboratory tests to the extent possible?" the examiner marked "no" and stated that "per veteran, lab tests have not been completed to exclude other clinical conditions." R. at 534.

Although the Board acknowledged "the Veteran's report that the Pandemic precluded her from undergoing a work-up for CFS," R. at 19, it still found that the examination did not include any findings that would trigger a work-up, *id*. However, it does seem that a work-up was in progress—she stated that she had made an appointment for one—but was delayed due to COVID-19. Thus, the Board's characterization of the September 2020 examination—that it did not suggest that a work-up was needed to determine whether Ms. Ortega had CFS—is not accurate. And so, a remand is warranted for the Board to adequately consider the September 2020 examination. *See Tucker*, 11 Vet.App. at 374; *Gilbert*, 1 Vet.App. at 56-57.

Because we are remanding the CFS claim, we need not address Ms. Ortega's additional arguments, which would not lead to a remedy greater than remand. *See Best v. Principi*, 15 Vet.App. 18, 19 (2001). And Ms. Ortega may make these arguments on remand. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002); *Kutscherousky v. West*, 12 Vet.App. 369, 372–73 (1999) (per curiam order); *see also Clark v. O'Rourke*, 30 Vet.App. 92, 97 (2018).

## B. GERD

Ms. Ortega asserts that the Board overlooked favorable evidence about her GERD claim, including information within Dr. Coley's opinion. Appellant's Br. at 28-29.

The Board stated that "Dr. C[oley] had no comment on the Veteran's GERD other than that service connection should be continued." R. at 12 (denying a GERD rating above 10%). However, Dr. Coley noted in her December 2019 opinion that, "[s]ince service connection there has been extension of [GERD], to include frequent heartburn, vomiting, pain in the chest and left arm/shoulder, and at times, choking. She sleeps on an incline to manage the condition at night." R. at 993.

Ms. Ortega's GERD is rated by analogy under 38 C.F.R. § 4.114, Diagnostic Code (DC) 7346 (hiatal hernia). At the time of the April 2024 Board decision, DC 7346 provided a 30% rating for "[p]ersistently recurrent epigastric distress with dysphagia, pyrosis, and regurgitation,

16

accompanied by substernal or arm or shoulder pain, productive of considerable impairment of health" and a 10% rating for "two or more symptoms for the 30[%] evaluation of less severity."[8]

The Board noted that an August 2020 VA examiner indicated that the sole symptoms the veteran reported were reflux and regurgitation. R. at 12. But, again, Dr. Coley noted arm/shoulder pain and the prior 30% rating criteria included arm or shoulder pain. Dr. Coley also documented that Ms. Ortega sometimes experienced choking and the prior 30% rating criteria included dysphagia (trouble swallowing). Thus, even if Dr. Coley's notation of heartburn and vomiting is similar to the August 2020 examiner's notation of reflux and regurgitation, there are two other symptoms aside from those.

And so, although the Board noted Dr. Coley's opinion, it did not provide adequate reasons for rejecting the favorable evidence contained within. *See Caluza*, 7 Vet.App. at 506. The Secretary argues that the veteran focuses on the number of symptoms, but the 30% rating requires "considerable impairment in health." Secretary's Br. at 22. He asserts that Dr. Coley offered no opinion on the severity of Ms. Ortega's symptoms, other than to say that she sleeps at an incline. It may be true that this ultimately does not show a "considerable impairment of health," but that is for the Board to discuss, which it did not. *See Caluza*, 7 Vet.App. at 506; *see also Washington v. Nicholson*, 19 Vet.App. 362, 369 (2005) (holding that the Board must in the first instance assess and weigh the evidence).

Thus, remand of the GERD claim is warranted. *See Tucker*, 11 Vet.App. at 374. On remand, the Board can also fix the characterization of the appeal period to reflect January 17, 2020, rather than July 17, 2020, as it mistakenly noted. R. at 12; *see* Appellant's Br. at 28.

### C. Left Knee Scars

Ms. Ortega contends that the Board overlooked favorable evidence, including the reason for her November 2018 knee surgery—which was to debride symptomatic scar tissue—and that, in 2017, she complained of her knee being worse because of scar tissue. Appellant's Br. at 29-30 (citing R. at 2449-50, 2381). First, the Court notes that she seems to mischaracterize the 2017 report, which was contained in a VA social work note and noted: "Veteran stated she's been trying to make sure that she doesn't do anything to make her knee worse as she has some scar tissue from

---

[8] An amended version became effective May 2024, which now states that DC 7346 (hiatal hernia and paraoesophageal hernia) is to be rated under DC 7203 (stricture of esophagus). That rating criteria focuses on dysphagia (trouble swallowing).

17

her previous surgery but that she is going to a chiropractor . . . to work on it." R. at 2381. This does not appear to say that her knee was worse because of scar tissue. However, the November 2018 operative note stated that the pre-operative and post-operative diagnosis was "symptomatic intra-articular scar tissue, left knee" and that one of the procedures performed was debridement of scar tissue. R. at 2449 (noting that the veteran had re-torn her ACL).

The Board denied a rating above 0% for left knee residual surgical scars. The Board stated that the criteria for a compensable rating for the scars had not been met and cited 38 C.F.R. § 4.118, DC 7804. R. at 7. Under DC 7804, a 10% rating is warranted for "one or two scars that are unstable or painful" and Note (1) provides that an "unstable scar is one where, for any reason, there is frequent loss of covering of skin over the scar." The Board noted that in August 2020, a VA examiner documented three scars and that they were healed, stable, and not painful. R. at 14-15. The Board also mentioned Dr. Coley's private December 2019 record in which she stated that the scars were painful, tender to touch, and itched. R. at 15. The Board then afforded greater weight to the other evidence than to Dr. Coley's opinion. *Id*. The Board found that it was unclear if Dr. Coley had examined the veteran's scars or relied on her lay statements. *Id*. The Board also stated that a March 2018 service treatment record noted that the scar over the midline was well healed. R. at 15-16. The Board then mentioned the August 2020 examination again, which said that the scars were stable and not painful. R. at 16.

But the Board did not discuss the November 2018 operative note, which, again, stated that the pre-operative and post-operative diagnosis was "symptomatic intra-articular scar tissue, left knee" and that one of the procedures performed was debridement of scar tissue. The November 2018 operative note came after the March 2018 record stating that a scar was well healed and before the August 2020 VA examination noting that the scars were stable and not painful. The November 2018 operative note does not state that the scars were unstable or painful, but it did say that the scar tissue was "symptomatic." And that is seemingly favorable evidence, particularly in light of the December 2019 private opinion stating that the scars were painful. Perhaps Ms. Ortega would only get a staged increased rating rather than one for the entire appeal period. But it is for the Board to discuss that evidence and weigh it against the other evidence of record. *See Washington*, 19 Vet.App. at 369; *Caluza*, 7 Vet.App. at 506. And so, remand of the left knee scar claim is also warranted. *See Tucker*, 11 Vet.App. at 374.

18

### IV. CONCLUSION

Based on the above, the part of the Board decision granting a 50% cephalgia rating is AFFIRMED. The parts of the Board decision denying service connection for left and right foot hallux valgus and left and right foot pes planus are VACATED and those claims are REMANDED for adjudication consistent with the instructions noted in this opinion. And the parts of the Board decision denying a GERD rating above 10%, a compensable left knee scar rating, and service connection for CFS are VACATED and those claims are REMANDED.

JAQUITH, *Judge*, concurring in part and dissenting in part: I concur in the Court's decision to vacate the parts of the Board decision denying service connection for left and right foot hallux valgus, left and right foot pes planus, and CFS, and the parts of the Board decision denying a GERD rating above 10% and a compensable left knee scar rating, and remanding all of those claims. But I dissent from the majority's affirmance of the Board's 50% cephalgia rating, and from the majority's determination that the obviously erroneous notice by the Board was not prejudicial—which may affect all of the veteran's disability ratings on remand.

#### A.  Remand for Extraschedular Consideration

Before further addressing the notice issue, there is a problem that should put the Board's cephalgia rating with the rating decisions vacated and remanded in the non-precedential portion of the Court's opinion. In September 2020, the AOJ granted service connection for cephalgia with an evaluation of 30%. R. at 480. The veteran's October 2020 NOD appealed her cephalgia rating, saying that it "should be 60%." R. at 467. The Board found that the veteran's migraine headaches are evaluated under 38 C.F.R. § 4.124a, Diagnostic Code 8100 (2025), which provides for a maximum rating of 50%. R. at 9. The Board relied on the findings and opinions of a private physician in concluding that, rather than the 30% rating by the AOJ, "the Veteran's headaches are more accurately characterized by an initial disability rating of 50%." R. at 11. However, the Board did not even mention that the veteran sought a 60% rating, which would be extraschedular. When a claimant "suggests that a schedular rating may be inadequate, the Board must specifically adjudicate the issue of whether referral for an extraschedular rating is warranted." *Thun v. Peake*, 22 Vet.App. 111, 115 (2008), *aff'd sub nom. Thun v. Shinseki*, 572 F.3d 1366 (Fed. Cir. 2009). The Court should remand the cephalgia claim for the Board to comply with *Thun*. Even if the majority envisions expanding the holding in *Witkowski* to render referral unnecessary, the Board must

19

specifically decide whether to refer the extraschedular rating issue or "hear those arguments itself [and adjudicate the issue]—as its jurisdiction would otherwise permit." *Witkowski v. Collins*, 38 Vet.App. 459, 470 (2025) (en banc). *But see* 38 C.F.R. § 3.321(b)(1) (2025) ("To accord justice to the exceptional case where the schedular evaluation is inadequate to rate a single service-connected disability, the Director of Compensation Service . . . is authorized to approve . . . an extra-schedular evaluation commensurate with the average impairment of earning capacity due exclusively to the disability."); *Bell v. McDonough*, 85 F.4th 1383, 1385 (Fed. Cir. 2023) (relying on *Thun's* endorsement of "the agency's long-standing interpretation of § 3.321(b)(1) as allowing agency recommendations alongside any requests for an extra-schedular determination").

Having followed the Board's lead in overlooking the veteran's claim for an extraschedular rating of her cephalgia, the majority blames the veteran. *Ante* at 8 n.7. That fingerpointing is misplaced, for the veteran specified that the cephalgia rating she appealed "should be 60%," R. at 467—and thus above the regulatory maximum—and then argued that the Board's notice errors deprived her of due process and the corresponding guaranty of a meaningful opportunity to submit evidence, especially where VA strictly applies the evidentiary record rule specified by section 7113(c). Reply Br. at 3-4. The veteran argued that, with proper notice, she could have "submitted the favorable medical evidence of record dated January through February 2021 that rebutted many of the Board's findings in the decision on appeal." Appellant's Br. at 19-20; OA at 19:10-26 ("just from the medical treatment records that we have from that 90-day period there is evidence there that she could have submitted that would have supported her claims"); *see* R. at 145-367; *see also infra* at 26. And she argued for remand because the effect of her lost opportunity to submit even more evidence to support an extraschedular rating for cephalgia was unquantifiable. Appellant's Br. at 20. Moreover, the Court's review authority is not cabined by the parties' arguments. *See* 38 U.S.C. § 7261; *Patton v. West*, 12 Vet.App. 272, 283 (1999) ("[C]ourts of appeals have the discretion to raise legal issues not raised by a party."); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("[T]he court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). The veteran's appeal to the Board sought an extraschedular rating for her cephalgia and her appeal to the Court of the Board's failure to award an extraschedular rating focused on having a meaningful opportunity to submit evidence in support of that appeal. In reviewing the Board's decision, the Court could consider the dispositive issue of the Board's complete failure to fulfill its

obligation to address the veteran's pursuit of an extraschedular rating even if the parties failed to specifically identify and brief it. *See U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993). The Board's failure to adjudicate the extraschedular rating issue is as obvious as the Board's denial of due process, but the majority chooses to look the other way. *See* Jonathan Swift, A TREATISE ON POLITE CONVERSATION 85 (1783) ("[T]here's none so blind, as they that won't see.").

### B.  Incorrect Notice

The majority identifies only half the problem in its framing of the due process issue. The majority asks—but decides not to answer—whether the Board violated Ms. Ortega's due process rights when it notified her that it received her NOD after the 90-day deadline to submit evidence had already passed. *Ante* at 9. The majority fails to mention that VA gave incorrect notice to begin with, even criticizing the claimant for failing to satisfy the incorrect deadline VA specified.

The AOJ's notice letter described VA's decision and said that, if the veteran disagreed with the decision, she had one year to select from three review options and submit the required application form. R. at 470. Regarding appealing to the Board, an attached form advised that the veteran "may request a hearing with a Veterans Law Judge and/or the opportunity to submit additional evidence." R. at 478. There was no notice of the time frame or deadline for submitting evidence. The notice did not include the required application form, instead referring the veteran to a website to obtain one. R. at 479.

The veteran located an NOD (VA Form 10182) and signed and submitted it on October 27, 2020, appealing the ratings for the disabilities at issue: her cephalgia, GERD, left knee scars, CFS, bilateral hallux valgus, and bilateral pes planus. R. at 467. The review option she chose was "Evidence Submission Reviewed by a Veterans Law Judge." *Id.* The preprinted form said, "I have additional evidence in support of my appeal that I will provide within the next 90 days, but I do not want a Board hearing." R. at 467. That "within the next 90 days" language on the preprinted form was the only notice of the veteran's opportunity to submit evidence. Unfortunately, that notice was patently incorrect. The applicable statute and regulation both provide that, for cases in which a hearing is not sought but an opportunity to submit evidence is requested, the evidentiary record before the Board is limited to the evidence considered by the AOJ, evidence submitted by the appellant with the NOD, and evidence submitted by the appellant "within 90 days following receipt

21

of the [NOD]." 38 U.S.C. § 7113(c); 38 C.F.R. § 20.303. Not "within the next 90 days"—within 90 days following the Board's receipt of the veteran's NOD.[9]

Adequate notice is "'[a]n elementary and fundamental requirement of due process.'" *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13 (1978) (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)). "[A]ctual notice is a minimum constitutional precondition" when, as here, the proceedings may adversely affect a veteran's property interest in her benefits. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983); *see Cushman v. Shinseki*, 576 F.3d 1290, 1298 (Fed. Cir. 2009) (holding that a veteran's "entitlement to [disability] benefits is a property interest protected by the Due Process Clause of the Fifth Amendment to the United States Constitution"). Indeed, "[t]he entire thrust of the VA's nonadversarial claims system is predicated upon a structure which provides for notice and an opportunity to be heard at virtually every step in the process." *Thurber v. Brown*, 5 Vet. App. 119, 123 (1993).

The AOJ is required to inform claimants for whom it has determined entitlement or nonentitlement of VA benefits, "of appellate rights provided by 38 U.S.C. chapters 71 and 72," which include the right guaranteed by section 7113(c) to submit evidence within 90 days following the Board's receipt of the veteran's NOD. 38 C.F.R. § 20.200 (2025).

Accepting incorrect notice as satisfying due process "would make the notice requirement useless, which is not acceptable in a nonadversarial system built on notice and the opportunity to be heard." *Wiker v. McDonough*, 36 Vet.App. 119, 126 (2023). Simply put, for notice to be adequate it must be accurate. *Cook v. McDonough*, 36 Vet.App. 175, 189 (2023). Although the Secretary inexplicably argues that there was no notice error, section 7113(c) says otherwise. Comparing the statute and VA's form, it is indisputable that VA erred. *See Wiker*, 36 Vet.App. at 126 ("[W]hen VA says in a regulation that it intends to give a veteran notice, we assume that means VA will give the veteran correct notice. And when it falls short of that, as it did here, VA errs.").

### C.  Misleading Notice That's Too Little Too Late

The Board compounded VA's notice error by never telling the veteran when VA received her NOD and by not providing correct notice until after the time for submitting evidence had

---

[9] Comparing the form to the statute and regulation is all that is needed to conclusively establish error. That VA subsequently corrected the form is a permissible consideration, given that the Federal Rules of Evidence have been held inapplicable to Board proceedings, *see, e.g., Boykin v. Derwinski*, 2 Vet.App. 479, 481 (1992), but the importance of the correction is that it diminishes the cost of VA doing the right thing to cases that arose before it fixed the problem—assuming the other notice shortcomings are also fixed.

passed. R. at 428. The veteran signed and mailed her NOD on October 27, 2020. R. at 467, 465. VA received her NOD on November 5, 2020, but never told the veteran that. R. at 465-66, 429-30. Instead, in its letter dated February 4, 2021, the Board said that it had received the veteran's "Board appeal request," without saying when, and that the veteran had 90 days from the (unspecified) date of the Board's receipt of her appeal to submit new evidence. R. at 428. The Board knew that it had received the veteran's NOD on November 5 and knew—or most certainly should have known, by simply counting the days—that her 90-day window had already expired when it finally and misleadingly provided accurate notice of that window.

The majority is unconcerned about the Board's neglectful illusion and blames the veteran for failing to make it through the misinformation. *Ante* at 4-5. The majority dismisses the veteran's "expectation that she would be notified when VA received her NOD and she would then submit evidence" because the majority "can't understand the origin of this expectation." *Ante* at 5. But the origin of that expectation was explained at oral argument: "in the regulatory history for the evidence lane, VA said this very concern was raised, and VA said, 'we will notify claimants in accordance with our laws, like we usually do.'" OA 17:40-54. The majority is deaf to her argument, *ante* at 5 n.3, but the veteran's detrimental reliance *was* made clear—her counsel expressly said, in response to a question from the panel about the veteran not submitting evidence, that "she was reasonably waiting for notice that her 10182 had arrived" . . . "her expectation was that she would be notified and then would submit evidence once she knew that it had arrived." OA 16:50-17:10. Moreover, the veteran's expectation was right. In promulgating 38 C.F.R. § 20.202(b)(3) following the enactment of the AMA, VA related that "commenters expressed concern that VA does not provide adequate notice as to when it received the [NOD] and therefore the veteran will not be able to calculate the relevant deadlines [for the submission of evidence]." VA Claims and Appeals Modernization, 84 Fed. Reg. 138, 152 (Jan. 18, 2019) (codified at 38 C.F.R. pts. 3, 8, 14, 19, 20, and 21). VA said that it "carefully considered this comment" and determined that no changes were required because "it is currently the Board's practice to notify veterans and representatives when an appeal has been received and docketed at the Board" and that even if VA's notice procedures changed based on technological systems and resources, "VA will continue to address this matter

23

through internal procedural guidance consistent with the law and regulations." *Id.* In this case, the Board did not fulfill VA's assurance.[10]

The veteran also argued that 38 C.F.R. § 3.110 required VA to calculate the 90-day period for submitting evidence from the date the Board mailed her notification of its receipt of her NOD. OA at 2:03-28; Appellant's Br. at 13; Reply Br. at 4-6. Section 3.110 provides, in subsection (a), that, "[i]n computing the time limit for any action required of a claimant or beneficiary, including the filing of claims or evidence requested by VA, the first day of the specified period will be excluded," and in subsection (b) that "[t]he first day of the specified period referred to in paragraph (a) of this section shall be the date of mailing of notification to the claimant or beneficiary of the action required and the time limit therefor." 38 C.F.R. § 3.110 (2025). As the veteran highlights, VA said § 3.110(b) was added because, "If claimants or beneficiaries are not furnished notice of the time limits within which they are required to act, it is unreasonable to penalize them for failing to act within those time limits." Procedural Due Process, 53 Fed. Reg. 37,797, 37,799 (Sep. 28, 1988). In promulgating the final rule, VA said the amendments were necessary "because of the need for more specificity in VA regulations on procedural due process." Procedural Due Process, 55 Fed. Reg. 13,522 (Apr. 11, 1990). VA specified that "it is the intent of VA to ensure, to the maximum extent practicable, that notice of any time limit within which a claimant or beneficiary must act, to perfect a claim or challenge an adverse VA decision, is effectively communicated to that claimant or beneficiary [because i]neffective notice is tantamount to no notice." *Id.* at 13,526. And VA specifically chose that "time limits established by VA regulations are computed from the date of the letter of notification [because t]he date of the letter of notification is known by VA, whereas the date of the postmark is not." *Id.* at 13,527.

The majority apparently favors the Secretary's view that § 3.110 doesn't apply because claimants are not required to submit evidence. *Ante* at 5 n.4; Secretary's Br. at 11. But the regulation gives, as an example of actions "required" of a claimant, "the filing of claims." 38 C.F.R.

---

[10] The Board also failed to follow through on its current process promise—"If the Board agrees to review your case, you'll get a letter telling you that the Board has added your case to the docket."—until it was too late to submit evidence. *See* Board Appeals, https://www.va.gov/decision-reviews/board-appeal/ Board Appeals (last visited Mar. 25, 2026). "If the Veteran submits an AMA NOD without selecting a Board review option, identifying the issues the Veteran wants to appeal, or that is unsigned, a clarification letter is sent to the Veteran." BOARD OF VETERANS' APPEALS OPERATIONS HANDBOOK, AMA Appeals Received at the Board 15 (April 2020). If no clarification is needed and the NOD is timely, "a Docketing Letter will be sent to the Veteran confirming an appeal has been docketed by the Board." *Id.* To the extent that this process was followed, it did not include meaningful notice of the actual 90-day window within which the veteran could submit evidence.

24

§ 3.110(a). Sure, veterans must file an NOD to go to the Board, but they also must submit evidence within the time limits set forth by section 7113 to get that evidence considered by the Board. Neither action is mandatory in a strict sense—the veteran could choose to file a supplemental claim or HLR request (or forgo the appeal entirely) rather than submit an NOD, just as he or she could chose the direct review or hearing dockets at the Board rather than opt for evidence submission. Just as an NOD is required to appeal to the Board, evidence is required to be submitted within the specified window to be considered by the Board.

The majority now acknowledges that the Court has held that § 3.110 sets the time limit for appealing rating decisions, *ante* at 6 n.5, so filing an NOD is a "required" action under § 3.110. *See Rowell v. Principi*, 4 Vet. App. 9, 15 (1993) (stating that § 3.110 clarifies the computation of the time limit for filing NODs such that "the letter notifying the veteran of the July 21, 1988, initial denial of his claim [wa]s dated August 3, 1988," so "under paragraphs (b) and (a), respectively, of § 3.110, August 3, 1988, is considered 'the first day of the specified period,' and that day is excluded from consideration in computing the time period for filing"); *see also Wells v. Peake*, No. 07-0913, 2008 WL 5111436, at *2 (Vet. App. Nov. 26, 2008) (applying § 3.110(b) to determine the time limit to file a Substantive Appeal); *Bautista v. Brown*, No. 92-0268, 1993 WL 439090, at *1 (Vet. App. Oct. 25, 1993) ("In the instant case, because the letter notifying the appellant of the October 28, 1988, rating decision denying his claim was dated November 14, 1988, the one-year period for filing the NOD began on November 15, 1988, and ended on November 14, 1989.").

The regulations cited at the end of § 3.110(b) are not in conflict with the regulation's application to starting the 90-day evidentiary window clock. Sections 19.52 and 20.203 adopt § 3.110(b)'s equivalency of the date of the letter and the date of mailing in the context of AOJ determinations that start the NOD clock, NODs, and Substantive Appeals, and § 20.110 accepts the postmark dates of claimants' filings that precede the expiration of applicable time limits. Reading the regulations together, *see Williams v. McDonough*, 37 Vet.App. 305, 310 (2024), § 3.110's computation for the time period beginning on the date the Board mails notice to the claimant of the time limit meshes perfectly with § 20.110's provisions that the time limit must end on a workday and that a response postmarked prior to the end of the time period must be accepted as having been timely filed. 38 C.F.R. §§ 3.110, 20.110. Effective communication of notice of the time limit within which the veteran must have submitted evidence to challenge the adverse VA

25

decisions is assuredly within the ambit of § 3.110, *see* 55 Fed. Reg. at 13,526, but was not provided by the Board or the AOJ.

### D.  The Notice Errors Were Prejudicial

"[P]rejudice is established by demonstrating a disruption of the essential fairness of the adjudication, which can be shown by demonstrating that the error . . . affected or could have affected the outcome of the determination." *Simmons v. Wilkie*, 30 Vet.App. 267, 279 (2018), *aff'd*, 964 F.3d 1381 (Fed. Cir. 2020). The claimant is required to explain how the error caused him or her harm. *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009). The obvious prejudice here is that the veteran never submitted additional evidence in support of her appeal. She explained how that happened. She expected that she would be notified, as VA promised, when VA received her NOD and accepted her appeal, and she would submit evidence then. OA at 16:51-17:12. When she finally received the Board's February 4, 2021, letter, she guessed that it was too late to submit evidence. OA at 16:20-17:15; Reply Br. at 1. After all, she knew that she had sent her NOD to the Board on October 27, 2020, and she had waited for the Board to notify her that it had received and accepted her appeal, but that had never happened. Then she received a letter from the Board dated February 4, 2021, that said she had 90 days from when the Board had received her NOD to have submitted evidence—still without telling her when such receipt had happened. Although she didn't know until much later, the Board had received her NOD on November 5, 2020—9 days after she sent it. If it took the same 9 days for the Board's letter to arrive, it would have been 109 days since she sent the Board her NOD. So it is not surprising that she guessed that it was too late for her to submit evidence and her guess was a reasonable and undoubtedly correct one in light of the precise evidentiary record requirements spelled out by statute and regulation—*see, e.g.,* 38 U.S.C. § 7113; *Green v. McDonough*, 37 Vet.App. 127, 135 (2024); and 38 C.F.R. §§ 20.301-.303 (2025)—and the strict enforcement by VA and the Board of the veteran's requirements but not the requirements for timely, accurate agency notice. "From VA's perspective, the closing of the evidentiary record is one of the foundational features of the AMA, and one of its most valuable in terms of enabling VA, over time, to process claims and appeals more efficiently." VA Claims and Appeals Modernization, 84 Fed. Reg. 138, 140 (Jan. 18, 2019). However, the Congressional design of the AMA to "help ensure that the process is both timely and fair,'" H. Rep. No. 115-135 at 5 (2017), depends on clear, accurate, timely, and complete notice. Such notice was pivotal here because the record shows that the veteran had material evidence to submit.

26

At the time of her September 2020 VA examination, the treatment plan for the veteran's migraines included only over-the-counter Tylenol as needed. R. at 525. Army treatment records show that on January 10, 2021, and again on January 25, 2021, the veteran was provided 50 mg sumatriptan succinate tablets to take at the start of migraine attacks. R. at 163, 199. On January 10, she was provided 27 tablets and told to take one tablet when an attack began and then take another tablet in 2 hours if necessary, but not more than 2 doses in 24 hours. R. at 163. In her refill on January 25, she was also instructed to start with one tablet and repeat in 2 hours as needed, and up to a maximum of 200 mg (which would be 4 doses) in 24 hours. R. at 199. "According to the American Headache Society guidelines, sumatriptan is recommended for the acute treatment of moderate-to-severe migraines." StatPearls, *Sumatriptan*, https://www.ncbi.nlm.nih.gov/books/NBK470206/ (last updated Nov. 12, 2023). *See* MigraineBuddy, *Managing Severe Migraines: When to Use Sumatriptan*, https://migrainebuddy.com/managing-severe-migraines-when-to-use-sumatriptan/ (Oct. 30, 2023) ("Sumatriptan is a commonly prescribed medication for managing severe migraines.").

Army treatment records also reflect evidence within the proper time window (through February 3, 2021) of other disabilities at issue, including the prescription of Diclofenac gel to treat the veteran's left knee scar pain, R. at 162, 224, and 230; the prescription of omeprazole to treat the veteran's GERD, R. at 199, 221, 223, 225, 226, and 230; and treatment for the veteran's chronic fatigue, R. at 223, 225, 229, and 232.

## E.   Conclusion

At the very least, the Board's affirmance of the cephalgia rating should be vacated and remanded so the Board can address (1) the veteran's request for an extraschedular rating, and (2) the notice errors—which the Board apparently did not realize VA and it had made—and then provide proper notice, afford the veteran her heretofore lost opportunity to submit additional evidence, and find facts to assess prejudice in the first instance. *See Tadlock v. McDonough*, 5 F.4th 1327, 1337-38 (Fed. Cir. 2021). "Where the effect of an error on the outcome of a proceeding is unquantifiable, however, we will not speculate as to what the outcome might have been had the error not occurred." *Wagner v. United States*, 365 F.3d 1358, 1365 (Fed. Cir. 2004) (quoted with approval by *Cowan v. McDonough*, 35 Vet.App. 232, 249 (2022)).

The majority reallocates the agency's notice obligation to the veteran, or at least leaves the veteran to bear the burden of the notice errors by VA and the Board. Ms. Ortega did not miss her

27

shot, *ante* at 7; VA and the Board hid the target. "[A] party's ability to take steps to safeguard its interests does not relieve the [agency] of its constitutional obligation." *Mennonite Bd. of Missions,* 462 U.S. at 800  (holding that notice by means "certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party"). And "the availability of supplemental claims is not the panacea for all Board procedural errors that the Secretary suggests." *Bolds v. McDonough*, 37 Vet.App. 359, 370 (2024). "Prejudice is established by demonstrating a disruption of the essential fairness of the adjudication, either by showing an error that prevented the claimant from effectively participating in the adjudicative process or that affected or could have affected the outcome of a decision." *Id.*, citing *Simmons*, 30 Vet.App. at 279. At a minimum, it is beyond cavil that the notice errors here could have affected the outcome.

"Close enough for government work" may be a bureaucracy's battle cry, but it has no place in denying one who has borne the actual battle timely, correct notice and the meaningful opportunity to be heard that such notice enables. (Ms. Ortega earned a Combat Action Badge for being actively engaged with the enemy in Afghanistan when a rocket hit the front of her living quarters and she administered first aid to two roommates who suffered bleeding wounds. R. at 269, 3481.) "Are we to become just another of the cascading impediments faced by veterans seeking the benefits conferred by Congress?" *Rosinski v. Shulkin*, 29 Vet.App. 183, 197 (2018) (Greenberg, J., dissenting).

The majority embraces the perfect trap for the unwary: in accordance with the explicit Congressional creation of an evidentiary record restriction that begins upon VA's receipt of the veteran's NOD and extends for 90 days, VA promulgated a regulation mimicking the statute but then provided incorrect notice of when the 90 days started, never told the veteran when it received her NOD, and only provided an accurate description of the event (but not the date) that started the 90 days after the 90-day deadline had expired. However, "[t]he VA disability compensation system is not meant to be a trap for the unwary." *Comer v. Peake*, 552 F.3d 1362, 1369 (Fed. Cir. 2009).

Creating confusion through inattention to notice requirements and then capitalizing on errors to deny benefits is intolerable in a disability compensation system "so uniquely pro-claimant, [where] the importance of systemic fairness and the appearance of fairness carries great weight," and "the ability of the Board to render a fair, or apparently fair, decision may depend on the veteran's ability to ensure the Board has all potentially relevant evidence before it." *Hodge v.*

28

*West*, 155 F.3d 1356, 1363 (Fed. Cir. 1998). I respectfully dissent from both the affirmance of the denial of the veteran's cephalgia claim and the Court's finding that the clear errors in the doubly faulty notice here were not prejudicial.