NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0211n.06

Case Nos. 25-1336/1589

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

May 12, 2026

KELLY L. STEPHENS, Clerk

OLDNAR CORPORATION, )
)
    Plaintiff-Appellant/Cross-Appellee, )
)
)
v. )
)
)
SANYO NORTH AMERICA CORPORATION, et al., )
)
    Defendants-Appellees/Cross-Appellants. )
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

Before: SUTTON, Chief Judge; MOORE and BUSH, Circuit Judges.

The court delivered a PER CURIAM opinion. BUSH, J. (pp. 11–17), delivered a separate dissenting opinion.

PER CURIAM. This case returns to us for a second time. In 2008, Nartron Corporation (known today as "Oldnar") and Sanyo Corporation (now a part of Panasonic) formed an agreement to work together on an in-car touchscreen, hoping to sell the product to General Motors. About 18 months later, Sanyo left Nartron for a new partner. Nartron responded by filing this federal lawsuit, alleging breach of contract and related claims. The district court granted summary judgment to Sanyo, but we reversed in part (finding there was potential liability on the breach of contract and unjust enrichment claims) and remanded for further consideration.

On remand, the district court found contract liability up to November 2009 but awarded only nominal damages in view of Nartron's failure to establish proof of cognizable damages up to

that point. The court found no further liability on Nartron's contract claim and no liability on its unjust enrichment claim. And it denied Sanyo's request for attorney's fees. Because we agree with the district court's damages ruling, and Nartron has presented no other damages calculation method or evidence to support their measure of damages, we affirm on that ground.

I.

Nartron Corporation makes touchscreen interfaces. Sanyo Corporation makes digital user interface systems. *See Oldnar Corp. v. Panasonic Corp. of N. Am.*, 766 F. App'x 255, 257 (6th Cir. 2019). In early 2008, the two companies joined forces to compete for a contract to produce digital interfaces for General Motors. *Id.* To that end, they entered into a Development and Supply Agreement on April 2, 2008, committing to work together on an in-car touchscreen that Sanyo could pitch to General Motors.

The terms of the agreement require some explanation. Section 9.3 of the agreement forbids either party from using the other's "intellectual property," and section 1.3 defines intellectual property "broadly." *Id.* at 257–58, 262. Section 5.1 structures "Product Agreement[s]." *Id.* at 258. These agreements govern the parties' relationship in two events: (1) if General Motors awards the touchscreen contract to Sanyo based on a product jointly developed with Nartron and (2) if Sanyo selects Nartron as the supplier of the touchscreen hardware for the contract. *Id.* By contrast, if General Motors selects the product jointly developed by Sanyo and Nartron, but thereafter Sanyo declines to select Nartron as the manufacturer or supplier, section 5.2 requires Nartron to license its intellectual property to Sanyo. *Id.* In that event, the same section grants Nartron royalties presumptively set at a 10% royalty on sales of the jointly developed product. *Id.*

In July 2009, Nartron and Sanyo jointly developed a prototype that initially appeared to impress General Motors. *Id.* With Nartron's help, Sanyo continued to advance through General

Motors' contracting process. Events took a turn in November of that year, however, when Sanyo informed Nartron that it would use an alternative to Nartron's proprietary microchip. *Id.* at 259. Working with a new partner (Atmel Corporation), Sanyo spent approximately $4,000,000 and 16 months to transition from the design it had developed with Nartron to a new product. It then won the General Motors contract, eventually receiving hundreds of millions of dollars in revenue.

Jilted, Nartron filed this federal lawsuit against Sanyo and Panasonic, which subsumed Sanyo in a merger. The operative complaint alleged breach of contract and unjust enrichment. The district court granted summary judgment to Sanyo. *Id.* On appeal, we affirmed in part, reversed in part, and remanded. *Id.* at 270–71. We held that Sanyo may have breached section 9.3 of the agreement by using Nartron's intellectual property, but that it had not breached sections 5.1 or 5.2. *Id.* We also held that Nartron may possess a valid unjust enrichment claim for the period after the Development Agreement ended. *Id.* at 267.

On remand, the district court held that Sanyo breached section 9.3 by using Nartron's intellectual property "for the period until November 2009." R.439 at 8. After that point, it reasoned, the product changed sufficiently that Sanyo no longer used Nartron's intellectual property. Liability settled, the parties briefed damages. Nartron identified one, and only one, method for calculating damages. The correct figure, it insisted, should track section 5.2's presumptive 10% royalty. The district court rejected that approach, noting that the Development Agreement provided for the 10% royalty figure only if Nartron and Sanyo jointly developed a technological product sold to a final purchaser. The final product that Sanyo sold to General Motors, however, was not the same one Sanyo developed with Nartron. Finding Nartron's sole measure of damages irrational and finding no evidence (or argumentation) to support a different approach, the district court awarded $1 in nominal damages.

3

Sanyo sought costs. Noting that it offered to stipulate to a $100,000 judgment, Sanyo moved for costs under Civil Rule 68 and Michigan Court Rule 2.405(D)(1). The Michigan court rule includes attorney's fees within its definition of costs. The district court held that state-law procedural rules like Michigan Court Rule 2.405(D)(1) do not apply in federal court. It accordingly granted Sanyo costs while denying it fees.

Nartron appealed, and Sanyo cross-appealed.

II.

Start with Nartron's appeal. It challenges the district court's denial of its breach-of-contract claim for conduct after November 2009, the court's rejection of its unjust enrichment claim, and the court's award of only nominal damages for the contract claim up to November 2009. Michigan law applies. *Oldnar*, 766 F. App'x at 260. On appeal from a bench trial, we give fresh review to the district court's legal conclusions and defer to its fact findings unless the evidence clearly contradicts them. *Chesnut v. United States*, 15 F.4th 436, 441 (6th Cir. 2021). Because we agree with the district court's damages ruling, and Nartron stated that it would use the same damages-calculation method for any damages arising post-November 2009, we need not reach the district court's liability decision. Regardless of liability after November 2009, Nartron offers no cognizable theory of damages, the only remedy it seeks.

*Nominal damages on contract claim.* Parties seeking damages bear the burden of proving damages "with a reasonable degree of certainty." *Allen v. Mich. Bell Tel. Co.*, 232 N.W.2d 302, 304–05 (Mich. Ct. App. 1975). "In the absence of an allegation and proof of actual damages, the plaintiff c[an] recover only nominal damages." *Barsky v. Katz*, 216 N.W. 382, 383 (Mich. 1927); *see 4041-49 W. Maple Condo. Ass'n v. Countrywide Home Loans, Inc.*, 768 N.W.2d 88, 93 (Mich. Ct. App. 2009) (per curiam).

Nartron failed to provide evidence of damages, prompting the district court to award only nominal damages. As Nartron admitted at oral argument in this Court, it presented evidence only for a damages methodology that adopted the contract's default 10% royalty for misappropriation of intellectual property. Oral Arg. at 7:28–7:40. Because the record does not support that approach and because it was the only one Nartron put forth, nominal damages were appropriate.

The structure of the contract makes plain that the 10% figure does not apply to Nartron's situation and would grossly overcompensate it. While Sanyo violated section 9.3 of the contract, that provision allows for royalty payments only as "set forth in [a] license agreement as identified in the Product Agreement." R.167-1 at 12. Because the parties never entered into such a license agreement, Nartron may not rely on that provision to determine the amount of royalties to which it claims entitlement. The default 10% royalty in section 5.2 likewise refers to 10% of the "sale price to a customer of the 'Parties System.'" R.167-1 at 4. The phrase "Parties System" refers to a "system to be sold by the Parties to an Original Equipment Manufacturer," like General Motors. R.167-1 at 4. As Nartron concedes, its intellectual property did not form any part of the system that Sanyo eventually sold to General Motors, even though it contends the system included certain of its "smarts"—four design choices. Appellant's Br. 16, 27, 36. Nartron's proposed methodology thus would tie damages to the amount Nartron would have received if Sanyo had used Nartron's property far more than it ever did. Contrary to the dissent's assertion, this is precisely the conclusion that the district court reached as to the viability of Nartron's 10% methodology based on section 5.2—that it was not legally applicable and "not the best evidence of the value the parties placed on Nartron's know-how." R.517 at 6–7.

By failing to substantiate its claim to a 10% royalty, Nartron left itself with no other viable methodology to calculate damages. It presented the district court with no other basis to assess its

injury.  Due to Nartron's strategic choice to present evidence supporting only one methodology, any figure beyond nominal damages would have been pulled from thin air.

Nartron insists that some deposition testimony supports the 10% figure.  Panasonic executive Todd Lancaster, it is true, stated that, if two parties had an agreement not to use each other's property without permission, and one party went on to do just that, "there would be some kind of agreement and there would be an expectation" of payment.  R.509-2 at 6.  We agree.  But that statement tells us nothing about how much payment the parties would expect.  And it offers no support for Nartron's 10% methodology, which would compensate Nartron for far more than its practical contribution to Sanyo's success.  The remarks of Sanyo's expert, Robert Levine, are of a piece.  No one disputes that businesses sometimes license property by "making a payment contingent upon the future success of the other party."  R.509-3 at 4.  But that humdrum reality does not justify a measure of damages that delinks the value of the property used from the value of the compensation expected.

Nartron points to evidence that it took Sanyo to "third base" in General Motors' process and should be rewarded accordingly.  R.509 at 6.  Maybe so.  But that still required Nartron to establish the value of getting to third base and still required Nartron to show damages different from the inapposite 10% home run it proposed.  The company never made any such effort.  It chose to rely on the 10% figure from section 5.2 alone, and it chose not to present any other methodology to calculate an appropriate amount of damages, even after completing discovery on damages.  Contrary to the dissent's contention, this conclusion is entirely consistent with Sanyo's argument that Nartron failed to present a legally cognizable theory of damages.  By basing its methodology for damages entirely on section 5.2, which is legally inapplicable, Nartron did just that—failed to present a legally cognizable theory of damages.

The forfeited opportunity to present such evidence likewise dooms Nartron's claim that we should reverse and remand the district court's liability determinations. *See* Appellee's Br. 39 (arguing that Nartron "waive[d]" the opportunity to present other damages methodologies). Nartron confirmed that its 10% damages methodology from section 5.2 of the contract would apply equally to any liability after 2009 and that it had no other proposed methodology for measuring damages. Oral Arg. 6:29–7:40, 30:08–30:50. True, as the dissent points out, unjust enrichment damages are different from contract damages. But Nartron's statement that its 10% methodology applies equally to liability after 2009 was not limited to its contract damages claim. Neither party, it bears noting, otherwise challenges the nominal damages award.

### III.

*Attorney's fees*. Sanyo cross-appeals the district court's denial of its request for attorney's fees. Because Sanyo offered to pay $100,000 to settle the case and because Nartron received less than that amount in damages, Sanyo claims it is entitled to attorney's fees. In making the argument, Sanyo invokes two grounds: Michigan Court Rule 2.405 and Federal Civil Rule 68.

Sanyo may not receive attorney's fees under Michigan's offer-of-judgment rule. MCR 2.405. The substantive "laws of the several states" form the "rules of decision in civil actions in the courts of the United States" except where federal law "otherwise require[s] or provide[s]." 28 U.S.C. § 1652. Michigan Court Rule 2.405 does not apply because it conflicts with Rule 68 and it does not qualify as "substantive" under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

The first step in deciding whether Michigan or federal law applies is "to determine whether, when fairly construed, the scope of [the Federal Rule] is 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving

no room for the operation of that law." *Albright v. Christensen,* 24 F.4th 1039, 1044 (6th Cir. 2022) (quoting *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4–5 (1987)); *see Berk v. Choy*, 146 S. Ct. 546, 552 (2026). To determine if the Federal Rule displaces state law, we "ask whether the Federal Rule 'answers the question in dispute.'" *Berk*, 146 S. Ct. at 552 (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)). The question here is what costs Sanyo may recover after making an offer of judgment to Nartron that was more favorable than the damages Nartron ultimately recovered.

Federal Rule 68 answers that question. It allows a party defending a claim to "serve on an opposing party an offer to allow judgment on specified terms." Fed R. Civ. P. 68(a). If the claimant rejects the proposal, and "the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68(d). The word "costs," within the meaning of Rule 68, "refer[s] to all costs properly awardable under the relevant substantive statute or other authority." *Marek v. Chesny*, 473 U.S. 1, 9 (1985). Rule 68 thus allows the awarding of fees when the substantive law defines attorney's fees "as part of the costs." *Id.* (construing 42 U.S.C. § 1988). Nartron sued for breach of contract and unjust enrichment. Nartron does not point to a Michigan statute or common law rule that provides for fee shifting in breach of contract and unjust enrichment suits where the contract does not itself allow for the recovery of fees. *Contrast* Mich. Comp. Laws § 445.1905 (shifting fees to discourage bad-faith trade-secrets litigation). It follows that unless Michigan Court Rule 2.405 is such a substantive law, which it is not for the reasons provided below, Federal Rule 68 would not allow Sanyo to recover attorney's fees.

Michigan Court Rule 2.405, on the other hand, would allow Sanyo to recover attorney's fees, because it provides that costs include attorney's fees. MCR 2.405(A)(6), (D)(1). Therefore,

Federal Rule 68 and Michigan Court Rule 2.405 conflict, and Rule 68 governs because it does not exceed statutory authorization or Congress's rulemaking power. *See, e.g.*, *Gil de Rebollo v. Miami Heat Ass'ns, Inc.*, 137 F.3d 56, 66 (1st Cir. 1998); *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167 (9th Cir. 1995); 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3001.2 (3d ed. 2025).

Because Michigan Court Rule 2.405 forms no part of Michigan's substantive law, it cannot serve as a source of substantive law for purposes of Rule 68. Federal courts treat fee-shifting provisions as substantive only when they "embody a substantive policy, such as a statute which permits a prevailing party in certain classes of litigation to recover fees." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 52 (1991); *see, e.g.*, Mich. Comp. Laws § 445.1905 (shifting fees to discourage bad-faith trade-secrets litigation). By contrast, we treat "a general [rule] that allows for the award of attorneys fees based upon the conduct of the parties and the attorneys in filing and litigating the claim, rather than for success on the underlying merits of the claim," as procedural. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 529 (6th Cir. 2002); *see Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 533 (6th Cir. 2008); *Gen. Elec. Co. v. Latin Am. Imps., S.A.*, 127 F. App'x 157, 159–60 (6th Cir. 2005). Michigan Court Rule 2.405 can shift fees in every class of case, and it applies based on litigation conduct rather than some underlying substantive policy. That makes it procedural. *See* MCR 2.001; *Marietta*, 307 F.3d at 529; *Degussa*, 277 F. App'x at 533. Michigan sources, in point of law, say just that: "The rules in this chapter govern procedure." MCR 2.001.

In resisting this conclusion, Sanyo overreads *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975), and *People of Sioux County v. National Surety Co.*, 276 U.S. 238 (1928). In *Alyeska*, the Supreme Court stated in dicta that "[i]n an ordinary diversity case . . . state

law denying the right to attorney's fees or giving a right thereto, *which reflects a substantial policy of the state*, should be followed."  421 U.S. at 259 n.31 (emphasis added) (quotation omitted). Because Michigan Court Rule 2.405 does not reflect a substantial policy, *Alyeska*'s dicta does not help Sanyo.  *Sioux County*, meanwhile, held only that federal courts sitting in diversity should apply a Nebraska statute that shifted fees in a specific class of cases:  suits against insurance companies.  276 U.S. at 242–43 & n.2 (noting that "it is the policy of the state to allow plaintiffs to recover an attorney's fee in certain cases").

For the foregoing reasons, the district court's damages and attorney's fees rulings were not erroneous.  We affirm.

**JOHN K. BUSH, Circuit Judge, dissenting.**  The district court committed several legal errors in calculating damages, and there is sufficient evidence for Nartron to go to trial on its damages theory.  I therefore respectfully dissent.

**I.**

The parties dispute whether Sanyo improperly used Nartron's know-how after November 2009.  But everyone agrees Sanyo used Nartron's know-how before then, § 9.3 of the Development and Supply Agreement (DSA) has no time limit on when it bars using Nartron's know-how, and Nartron's damages theory does not depend on when or how much of the know-how was used.  That means all that is left to do is calculate damages.  *See* Fed. R. Civ. P. 61.  On that point, the district court erred in three ways.

*First*, the district court incorrectly concluded that Nartron did not suffer any "damages after November 2009" because that is when the relationship ended.  R. 439, Opinion and Order, PageID 7255.  In fact, the DSA did not end until 2012, and GM made its purchase order to Sanyo in the summer of 2009.  At that point, Sanyo's failure to sign a licensing agreement injured Nartron because, had such an agreement been signed, Nartron would have received a royalty.  Under Michigan law, damages can accrue at any point before or after a contract ends if the breach occurred within the contract period.  *See, e.g.*, *Anderson v. Westwood Cmty. Sch. Dist.*, 212 N.W.2d 232, 409–10 (Mich. Ct. App. 1973).  Here, damages are recoverable post-2009 because the breach occurred while the DSA remained in effect.

*Second*, the district court erred when it concluded that royalty damages were not available under the DSA because § 9.3 barred "any" use of Nartron's know-how unless Sanyo paid a "royalty or other fee[] . . . ."  R. 70-2, DSA § 9.3, PageID 1004.  The majority suggests that royalties are not available because there was no licensing agreement under § 9.3.  *See* Majority at

11

5. But using the know-how without signing the licensing agreement *was* the violation of § 9.3. In essence, the majority argues that Nartron is not entitled to damages precisely *because* Sanyo breached. That makes no sense, and it is not the law. Contract damages seek to give the plaintiff what it would have been paid if the defendant complied with the terms of the contract. *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278, 280 (Mich. 1996). And had Sanyo signed the licensing agreement called for in § 9.3, Nartron would have received a royalty.

*Third*, the district court erred when it concluded that Nartron's damages were too speculative to warrant compensatory damages. In Michigan, damages are not speculative when harm is established. *See Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 852 (Mich. Ct. App. 2005) (special panel) ("Furthermore, the certainty requirement is relaxed where damages have been established but the amount of damages remains an open question."). And, as all agree, Nartron was harmed because Sanyo used Nartron's know-how without paying for it in violation of the DSA—a finding that no one challenges on appeal.

In holding otherwise, the district court conflated royalty damages and liquidated damages. In reasoning echoed by the majority (at 5), the district court said that "Natron has not shown that" a 10% "royalty is reasonably tied to the value of the know-how, to any harm suffered by Natron, or to the benefit received by [Sanyo] from its use of that know-how." R. 517, Order, PageID 8245. Although a court may refuse to enforce a liquidated damages clause if the damages are not tethered to the value of the contract, *see, e.g.*, *Decker v. Pierce*, 157 N.W. 384, 387 (Mich. 1916), Nartron asked for royalty damages. The 10% fee was the actual fee that Sanyo would have paid if it had complied with § 9.3 because this is the fee that § 5.2 of the DSA said the parties would agree to. Even if this amount seems excessive in retrospect, a contract is not unenforceable "simply because

it is foolish for one party or very advantageous to the other." *Liparoto Const., Inc. v. Gen. Shale Brick, Inc.*, 772 N.W.2d 801, 805 (Mich. Ct. App. 2009).

Moreover, the promised 10% royalty may not be foolish at all from Sanyo's perspective, even if Sanyo did not incorporate Nartron's know-how in the final product sold to GM. Sanyo needed Nartron's know-how incorporated into a prototype to advance in the approval process with GM. *See* R. 439, Order, PageID 7254–55. Touchscreen hardware is ubiquitous in American cars today, but it was not in 2008, and Sanyo needed a prototype in that then-nascent vehicle touchscreen market. Nartron provided Sanyo with much-needed know-how, which allowed Sanyo to get to second or third base in a game where Sanyo might have otherwise struck out. *See id.* at PageID 7254–55. Atmel would not have been able to hit a home run if Sanyo made the third out before Atmel had a chance to bat, and Nartron hitting a double or triple instead of striking out is what allowed that to happen for Atmel. In other words, a factfinder could reasonably believe that Sanyo promised a 10% royalty to Nartron for its know-how just so it could stay in the game for GM's business, even if another batter would be needed to bring the runner home.[1]

The majority does not dispute any of this. Instead, it excuses these errors by saying that they are harmless because Nartron failed to prove that it was entitled to 10% of sales as a royalty as a matter of fact. *See* Majority at 5. That is incorrect in several respects.

To start, Sanyo has never made the argument that the majority now uses to justify its holding—that the district court's errors were harmless because Nartron's damages methodology failed as a matter of fact—so any argument to that effect is waived. *See, e.g.*, *Lovins v. Parker*,

---

[1] Indeed, in retrospect, $43 million might be a steal for what Nartron enabled Sanyo to do. Allowing Sanyo to win the GM contract ultimately got Sanyo into one of the most lucrative sectors of the automotive industry at a time when virtually no one else was getting started. This positioned Sanyo as a market leader in this technology, allowing Sanyo to get its product into other cars for years or even decades to come. After all, in a race to the top, second place is just the first loser.

712 F.3d 283, 303 (6th Cir. 2013). For all its talk about Nartron's "strategic choice to present evidence supporting only one [damages] methodology" and Nartron's having "forfeited the opportunity to present" additional evidence, Majority at 6–7, the majority readily affirms on a theory "that [Sanyo] never asserted and that [Nartron] never had the chance to address," *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam). Just as Nartron submitted "one, and only one" theory of damages, *id.*, Sanyo submitted "one, and only one" basis for undermining that theory, *id.*—that "Nartron failed to propose a *legally* cognizable basis for awarding it damages," Appellee's Br. in No. 25-1336 at 38 (emphasis added). "The party presentation principle is supple," *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020), but the majority does not get to pick and choose when it applies.

Additionally, the district court *never* said that Nartron's damages theory failed for lack of evidence, holding instead that Nartron's damages theory was *legally* insufficient. *See* R. 517, Opinion, PageID 8243 ("Section 5.2 of the DSA . . . is . . . inapplicable."); *id.* at PageID 8245 (holding that Nartron's damages methodology is improperly speculative).[2] The district court never made the factual findings the majority purports to rely on, and it errs by supplying them on appeal. *See Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir. 1983) ("[T]he court of appeals is not equipped to receive evidence or function as a fact-finder.").

---

[2] The majority takes the district court out of context in trying to justify its view of the party presentation rule. *See* Majority at 5. By saying that the damages methodology was "not the best evidence of the value the parties placed on Nartron's know-how," the district court was bolstering its (incorrect) *legal* conclusion that the royalty needed to be tied to the value of the know-how. R. 517, Order, PageID 8244. But, as I noted above, this is a royalties clause, not a liquidated damages clause, so the actual value of the underlying know-how is irrelevant. The question we need to ask is what Nartron would have been paid for its know-how had Sanyo not breached, and the district court here is asking what the know-how is worth in the abstract. And, as I note below, it makes perfect legal and economic sense to be asking the former rather than the latter because Sanyo's focus in the early stages of the project was not on getting a product to market; it was on staying in the running for the purchase order, and Nartron's know-how achieved that, even if it did not go into the final product.

Finally, and most importantly, the majority ignores perhaps the most probative evidence that the parties valued Nartron's know-how at 10% of sales—Sanyo's own decision to agree to pay that much in § 5.2 of the DSA. In other words, Sanyo itself valued Nartron's know-how at 10% of sales when it signed the DSA.

To avoid this result, the majority effectively excises the relevant contract language. Section 5.2 sets the licensing fee at "10% of the 'Parties System' sale price of the 'Parties System' *or any variants made*." R. 70-2, DSA § 5.2, PageID 999 (emphasis added). In other words, the royalty that Nartron was to earn for the use of its know-how did not depend on whether the know-how went into the final product, just whether it was used in the process of developing the final product. The "any variants made" language is key here because "Parties System" refers to a product jointly "sold by the Parties to an Original Equipment Manufacturer," R. 70-2, DSA § 5.1, PageID 999, and we cannot read contracts in a way that would render certain words superfluous, *see Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). Thus, the most logical way to interpret § 5.2 is to read that language as allowing for a 10% royalty on any product that either (a) had Nartron's IP or (b) is a variant of a product that came from Nartron's know-how. Since we all agree that Nartron's know-how was used in the process of creating the final product, option (b) applies, and Nartron would have received 10% of sales of the final product.

Additionally, even if the contract itself did not call for this result, Nartron has presented enough evidence for a factfinder to conclude by a preponderance of the evidence that Sanyo would have signed such a contract. *See El-Khalil v. Oakwood Healthcare, Inc.*, 934 N.W.2d 665, 672 (Mich. 2019). Todd Lancaster testified that parties normally expect to sign a licensing agreement outlining the compensation for the use of know-how during the development of a product. R. 509-2, Lancaster Dep., PageID 8087 ("Yes, I would imagine that there would be some kind of

agreement and there would be an expectation" of compensation.). Meanwhile, Robert Levine testified that it is "common" to sign an agreement where "payment" is "contingent upon the future success of the other party." R. 509-3, Levine Dep., PageID 8095. Combined with the fact that, under the majority's reading, Sanyo would have paid 10% of sales to put Nartron's IP in the final product, a factfinder could conclude that Sanyo probably would have done so to use Nartron's IP simpliciter. After all, Lancaster testified that "[g]enerally," a company like Sanyo wins the final production contract with a company like GM when that company gets to the development stage, as was the case here when Sanyo used Nartron's know-how. R. 509-2, Lancaster Dep., PageID 8084. So even if Sanyo was willing to make such a payment only if Natron's IP went into the final product, a factfinder could conclude that Sanyo expected Natron's IP to go into the final product and was therefore willing to sign a contract without such a requirement based on that expectation.

## II.

I also disagree with what appears to be the majority's disposition of the unjust-enrichment claim. Although any alleged error as to liability on the breach-of-contract claim was harmless, that does not dispose of the unjust-enrichment claim because the remedies for breach of contract and unjust enrichment are different. "The remedy for unjust enrichment is" to force the "party who yielded excessive and unjust benefits" to give that money to the plaintiff. *Wright v. Genesee Cnty.*, 934 N.W.2d 805, 809–10 (Mich. 2019). It has nothing to do with how much the plaintiff would have been paid had the defendant not acted inequitably. The district court did not make any factual findings on this point, so holding that its error was harmless is unsupported. We cannot determine if the district court would have come to the same conclusion if it did not err because we do not know what facts it would have applied to the correct legal framework.

As to the merits, the district court applied the wrong standard for the unjust-enrichment claim. A defendant is unjustly enriched when the plaintiff shows "(1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit." *Bellevue Ventures, Inc. v. Morang-Kelly Inv., Inc.*, 836 N.W.2d 898, 901 (Mich. Ct. App. 2013). But the district court did not discuss whether Nartron conferred a benefit on Sanyo, nor did it address whether Sanyo's retention of that benefit would be unfair. The district court similarly erred when concluding that Sanyo was not unjustly enriched because Nartron did not suffer damages. Whether Nartron sustained damages is irrelevant. The remedy in this unjust enrichment case is measured by the benefit Sanyo retained, not the harm that Nartron suffered. The district court erred in concluding otherwise.

### III.

For the foregoing reasons, I respectfully dissent.[3]

---

[3] Because I would have sided with Nartron in its appeal, I would have dismissed Sanyo's appeal without prejudice to it renewing its arguments after the damages trial. A defendant is entitled to post-offer-of-judgment costs only when "the judgment that the [plaintiff] finally obtains is not more favorable than the unaccepted offer." Fed. R. Civ. P. 68(d). But I would have remanded for a new damages calculation, so Sanyo might not have been entitled to its costs on remand. That would have rendered any opinion on the offer-of-judgment issue impermissibly advisory. *See, e.g.*, *Grendell v. Ohio Supreme Ct.*, 252 F.3d 828, 838 (6th Cir. 2001).